NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE DEPENDENCY AS TO M.B.

No. 1 CA-JV 23-0095
FILED 10-24-2023

Appeal from the Superior Court in Maricopa County
No. JD534972
The Honorable Amanda M. Parker, Judge

**AFFIRMED**

COUNSEL

Maricopa County Public Advocate, Mesa
By Suzanne W. Sanchez
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Dawn Rachelle Williams
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge David D. Weinzweig and Judge Michael S. Catlett joined.

---

**C R U Z**, Judge:

¶1        Mother appeals the superior court's order adjudicating her child dependent.  For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2        M.B. was born in 2008 to Mother and Father.[1]  M.B. is an "Indian child" as defined by the Indian Child Welfare Act, which applies to these proceedings.  *See* 25 U.S.C. § 1903(4).  When M.B. was ten years old, Mother and Father ended their relationship.  Mother and M.B. then moved to Arizona; Father remained in Kansas.

¶3        Soon afterwards, M.B. displayed behavioral issues in school. Twice he expressed fear of Mother, alleging she had physically abused him and stated he would run away if returned to her home.  A police officer spoke with Mother in January 2019 about the allegations, which she denied; the officer encouraged her to obtain behavioral-health services for M.B. Mother responded that she wanted a "scared straight" program that could take M.B. for the night.  The officer told her he knew of no such program in Arizona but suggested respite services.

¶4        Although Mother was an employee of the Department of Child Safety ("DCS") and likely familiar with services available to help struggling parents, she obtained no services for M.B. over the next two years. At most, she investigated an outdoor behavioral health program but later testified it was cost prohibitive.  Meanwhile, a Kansas court awarded

---

[1]        Father is not a party to this appeal.

Mother "primary residential placement" of M.B. and Father parenting time "as determined by the agreement of the parties."[2]

¶5        M.B.'s behaviors escalated, and in February 2022, Mother admitted him to Mind 24-7 for mental-health crisis services.  Although the provider recommended he continue behavioral-health services after discharge, Mother did not follow through with that recommendation.  Instead, she sent M.B. to live with a friend and later testified she could not obtain services for him because he was not living with her.

¶6        A month later, Mother brought M.B. home, but he ran away later that night.  Mother did not report him as a runaway to law enforcement.  When law enforcement located M.B., Mother stated that she was having lunch and it "would be a while before she could pick" him up, forcing DCS to take temporary custody of him.  Soon afterwards, Mother sent him to Kansas to live with his grandmother and eventually, Father.

¶7        In June 2022, M.B. texted Mother begging to return to Arizona, but she responded only that she loved him and urged him to "[b]e good to your dad."  Later, she told Father she hoped "they" would not try to send him back to Arizona.  A few weeks later, thirteen-year-old M.B. ran away from Father's house and made his way to Arizona.  Mother could not explain how M.B. traveled that far as a minor and did not try to find him, although she ensured Father reported him as missing.  Even though M.B. was missing, when Mother's employment with DCS ended, she left Arizona to stay in Nebraska with friends.

¶8        When police located M.B. in Arizona in late July, Mother stated she would not come pick him up and sent a friend instead.  But when that friend took M.B. to the airport to return him to Father, he ran away again.

¶9        M.B. was apprehended by law enforcement a month later and appeared very thin.  Mother indicated that she could not pick up M.B. and did not make immediate arrangements for him, so DCS took custody of him.  At that time, Mother told DCS that although she "would love for her son to be with her," she did "not know how to keep him safe" and did not ask to reunify with him because she believed he would be better off living

---

[2]        Because of this prior custody determination, Arizona and Kansas courts conferred later, and Kansas relinquished its jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act to Arizona.  *See* Arizona Revised Statutes ("A.R.S.") sections 25-1001 to -1067.

with Father. Alternatively, Mother stated she wanted M.B. incarcerated or in a military school. Mother provided the names of friends who could "hopefully" help with M.B. but later reported that no one would be willing to care for him.

¶10 Three days after DCS took emergency custody of M.B., Mother still had not returned to Arizona or come up with a plan for his care. DCS therefore filed a petition alleging that M.B. was dependent due to Mother's neglect and inability or unwillingness to provide him with proper and effective parental care and control. *See* A.R.S. § 8-201(15)(a)(i), (iii).

¶11 DCS placed M.B. in a group home, but he ran away that same day. A few weeks later, police located M.B. and DCS placed him with the family of a friend. M.B. told DCS that Mother used to hit him with a belt and cuss at him or call him stupid. He also stated that he did not have a good relationship with his parents, did not feel loved or wanted by them, and wished to be adopted by a new family. That same month, Mother returned to Arizona.

¶12 DCS referred Mother to the Nurturing Parenting Program, but she reported to the provider that she did not want to fight for M.B. and believed he should be placed at Canyon State Academy. In a self-assessment, Mother gave herself a perfect score regarding her parenting skills, which the provider noted demonstrated her lack of insight into how her choices had impacted M.B. In the same assessment, Mother described him as "spoiled." Before trial, Mother did not show any urgency to visit with M.B., and M.B. refused to visit with Mother.

¶13 The superior court held a dependency trial. There, Mother agreed she was unable to provide M.B. with proper parental care and control because of his behaviors but denied that she had neglected him. Ultimately, the court adjudicated M.B. dependent based on neglect and Mother's inability to control M.B.'s behaviors. It then held a disposition hearing where it set a case plan of family reunification and found M.B. "continue[d] to be dependent according to the statutes." Mother appealed both orders. We have jurisdiction under A.R.S. § 8-235(A).

## DISCUSSION

¶14 Although Mother concedes that M.B. is dependent because she is unable to provide him with proper and effective parental care and control, she argues that insufficient evidence supports the court's finding that she neglected him.

4

**¶15** She does not challenge the court's findings that her continued custody of M.B. is likely to result in serious emotional or physical damage or that DCS made active but unsuccessful efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the family. *See* 25 U.S.C. § 1912(d)-(e). She has therefore waived those arguments on appeal. *See ELM Ret. Ctr. v. Callaway*, 226 Ariz. 287, 292, ¶ 24 n.1 (App. 2010) ("Issues not clearly raised and argued on appeal are waived.").

**¶16** As an initial matter, DCS suggests that Mother is not an aggrieved party because she concedes that M.B. is dependent under A.R.S. § 8-201(15)(a)(i). This court has "an independent duty to determine [its] own jurisdiction, which is prescribed by statute," and has "no authority to entertain an appeal over which [it does] not have jurisdiction." *In re Marriage of Johnson & Gravino*, 231 Ariz. 228, 230, ¶ 5 (App. 2012) (citations omitted).

**¶17** An order declaring a child dependent is a final, appealable order. *Jewel C. v. Dep't of Child Safety*, 244 Ariz. 347, 350, ¶ 8 (App. 2018). An aggrieved party may appeal from a final order of the juvenile court. A.R.S. § 8-235(A). "To qualify as an aggrieved party, the judgment must operate to deny the party some personal or property right or to impose a substantial burden on the party." *Jewel C.*, 244 Ariz. at 349, ¶ 3 (citation and internal quotation marks omitted). A parent who contests his or her child's dependency adjudication is an aggrieved party. *Lindsey M. v. Ariz. Dep't of Econ. Sec.*, 212 Ariz. 43, 46, ¶ 12 (App. 2006).

**¶18** Mother is not fully contesting the dependency adjudication. Rather she is appealing only one basis for it. Nonetheless, as DCS acknowledges, a finding that she neglected M.B. may place her on DCS's central registry. *See* A.R.S. § 8-804(A) ("A finding made by a court . . . that a child is dependent based on an allegation of abuse or neglect shall be recorded as a substantiated finding of abuse or neglect" on DCS's central registry.). As this court has recognized, such placement causes independent consequences for a parent, including disqualification "from obtaining or maintaining various licenses, certifications, or employment in working with children." *In re Dependency as to G.R.*, 255 Ariz. 444, 447, ¶ 15 (App. 2023) (citation and internal quotation marks omitted). Thus, a finding of dependency based on neglect places a substantial burden on Mother, and she is an aggrieved party. For these same reasons, we do not find her claims moot. *See Hormel v. Maricopa Cnty.*, 224 Ariz. 454, 460, ¶ 25 (App. 2010) (decision is moot when action by the reviewing court would have *no* effect on the parties).

**¶19**      Turning to the merits, this court will accept the superior court's factual findings "if reasonable evidence and inferences support them" and will affirm the court's legal conclusions unless they are clearly erroneous. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478, ¶¶ 30-31 (2023) (citation omitted). The court's legal conclusions are clearly erroneous only if this court determines as a matter of law that no one could reasonably find the evidence supporting them to meet the applicable burden of proof. *Id.* at 479, ¶ 31 (citation omitted).

**¶20**      The superior court must determine whether a child is dependent by a preponderance of the evidence. A.R.S. § 8-844(C)(1). A "Dependent Child" is one who is adjudicated to be "[i]n need of proper and effective parental care and control and who has . . . no parent . . . willing to exercise or capable of exercising such care and control" or "whose home is unfit by reason of abuse [or] neglect . . . by a parent, a guardian or any other person having custody or care of the child." A.R.S. § 8-201(15)(a)(i), (iii). "Neglect" means a parent's "inability or unwillingness . . . to provide [a] child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes substantial risk of harm to the child's health or welfare." A.R.S. § 8-201(25)(a).

**¶21**      "[T]he juvenile court must consider the circumstances as they exist at the time of the dependency adjudication hearing in determining whether a child is a dependent child." *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 48, ¶ 1 (App. 2016). A child may be dependent when the parent is unwilling or unable to protect the child from abuse or neglect. *See id.* at 50, ¶ 14 (citation omitted).

**¶22**      Here, Mother argues that she "took adequate measures to address [M.B.'s] behaviors" but that his "repeated running away negatively impacted [her] ability to address" them.

**¶23**      The superior court found, however, that despite M.B.'s repeated running away, Mother's efforts to address the root of his behavioral problems were slight. It found also that Mother had neglected M.B. by "turn[ing] a blind eye to [his] serious needs, refus[ing] to get meaningful help for him, and fail[ing] to keep adequate tabs on his whereabouts." The record supports the court's findings.

**¶24**      As for services, Mother secured only a two-day stay in a crisis center several years after M.B. began having behavioral problems but otherwise failed to get him regular treatment while he was in her custody. Nor did she present any evidence that she helped facilitate services for him

after she sent him to live with friends or relatives. Even considering M.B.'s proclivity to run away, Mother's actions to secure help for him were minimal.

¶25 Mother also failed to keep adequate tabs on M.B.'s whereabouts, and at times, refused to take custody of him. As the court found, Mother reported his missing status to law enforcement on numerous (but not all) occasions. And as DCS reported, Mother often, "showed no urgency in making it a priority to ensure his safety," took no steps to locate him, and evidenced "no rush to return [to Arizona] to care for" him.

¶26 Indeed, Mother was M.B.'s primary custodial parent, but had not parented him since February 2022. Instead, she relied on others to care for M.B. and to retrieve him when police or DCS got involved. She also reported to DCS and her Nurturing Parenting provider that she did not want to fight for him and felt he should be placed with Father or in a facility.

¶27 Mother's inability or unwillingness to supervise M.B. and provide him with regular behavioral-health services caused a substantial risk of harm to his welfare. At thirteen years old, M.B. could not secure housing or employment and therefore had no means to feed or protect himself. Mother could not explain how M.B. got to Arizona from Kansas by himself, and when he entered DCS care, he was described as "super super thin." Even then, Mother was unwilling or unable to take custody of him to protect him from harm.

¶28 Overall, the record supports the superior court's finding that Mother neglected M.B.

## CONCLUSION

¶29 For the foregoing reasons, we affirm.

